1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10  ROHR, INC.,

CASE NO. 11cv617-GPC (WVG)

11              Plaintiff,

**ORDER:**

12

**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT UPS-SUPPLY CHAIN SOLUTIONS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**;

13

14  vs.

15

[Doc. No. 61]

16

**(2) DENYING PLAINTIFF ROHR, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**;

17

18  UPS-SUPPLY CHAIN SOLUTIONS, INC., et al.,

[Doc. No. 62]

19

20              Defendants.

**(3) DENYING DEFENDANT KNIGHT TRANSPORTATION, INC.'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**

21

22

[Doc. No. 64]

23        This action arises out of two international shipments of cargo between Italy

24  and Southern California.  In both instances, after arriving at port unharmed, the

25  cargo sustained damage while en route to a final inland destination.  Plaintiff Rohr,

26  Inc. ("Rohr") and Defendant UPS-Supply Chain Solutions, Inc. ("UPS-SCS") have

27  filed motions for partial summary judgment addressing the following issues: (1)

28  whether the Carmack Amendment to the Interstate Commerce Act imposes liability

on UPS-SCS for damage to the cargo; if so, (2) whether the liability of UPS-SCS is contractually limited; and (3) whether the limitations on liability, if any, are valid and enforceable.  Rohr also moves for partial summary judgment as to the liability of Defendant Knight Transportation, Inc. ("Knight").  Knight has filed a renewed motion for partial summary judgment, arguing that the Carriage of Goods by Sea Act limits its liability for damages to cargo incurred during the first shipment.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** UPS-SCS's motion, **DENIES** Knight's motion, and **DENIES** Rohr's motion in substantial part.

Procedural Background

Rohr initiated this action against UPS-SCS, Knight, and CAL Modal Freight Systems, Inc. ("CAL Modal") on March 21, 2011.  *See* Doc. No. 1.  Rohr's original complaint alleges two breach of contract claims against UPS-SCS, brought pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 ("Carmack"); a Carmack breach of contract claim against Knight; and five separate claims against CAL Modal, including breach of contract under Carmack, conversion, trespass to chattel, negligence, and negligence *per se*.  *Id*. ¶¶ 31-76.

Subsequent to service of the original complaint, UPS-SCS filed cross-claims against Knight and CAL Modal for indemnification, equitable partial indemnification, and contribution.  *See* Doc. No. 11.  Knight also filed cross-claims against UPS-SCS for equitable indemnity and apportionment.  *See* Doc. No. 7.

Rohr served a summons and the original complaint on CAL Modal on April 7, 2011.  CAL Modal's response to the complaint was due on April 28, 2011.  *See* Doc. No. 5.  UPS-SCS served CAL Modal with the cross-claims on June 8, 2011.  CAL Modal's response to the cross-claims was due on June 29, 2011.  *See* Doc. No. 18.  CAL Modal failed to file an answer or otherwise respond to either Rohr or UPS-SCS's allegations, and the Clerk of Court entered default against CAL Modal on all claims and cross-claims.  *See* Doc. Nos. 29, 31.

1    On March 13, 2012, Knight filed a motion for partial summary judgment on

2   the issue of its limited liability for damages incurred by the cargo it transported.

3   *See* Doc. No. 45.  The Court held a hearing on June 4, 2012 and denied the motion

4   on the record.[1]  *See* Doc. No. 60.

5    On April 18, 2012, the Court granted Rohr leave to file a First Amended

6   Complaint, adding six claims against UPS-SCS for negligence, gross negligence,

7   and negligence *per se*.  *See* Doc. No. 50.  Soon thereafter, the Court issued an order

8   granting Rohr and UPS-SCS leave to delay moving for entry of default judgment

9   against CAL Modal until a determination is made as to the amount of damages

10   owed to Rohr, if any, and by whom.  *See* Doc. No. 57.

11    Discovery closed on May 18, 2012.  *See* Amended Scheduling Order ¶ 4,

12   Doc. No. 44.  Rohr and UPS-SCS timely filed motions for partial summary

13   judgment on June 15, 2012.  *Id*. ¶ 5 (setting a June 15, 2012 deadline for filing

14   dispositive motions); Doc. Nos. 61, 62.  Knight filed a self-styled "renewed" motion

15   for partial summary judgment on July 31, 2012.  *See* Doc. No. 64.

16   **FACTUAL BACKGROUND**[2]

17    Rohr is a wholly-owned subsidiary of Goodrich Corporation and is

18   headquartered in Chula Vista, California.[3]  *See* Rohr's Memo. ISO MPSJ, Doc. No.

19   62-1 at 3.  Rohr manufactures aerospace equipment, such as nacelle systems for

20   commercial and military aircraft.[4]  UPS-SCS is a subsidiary of United Parcel

21

22    [1] The Honorable John A. Houston, presiding. This matter was transferred to the undersigned
23   on October 4, 2012.  *See* Doc. No. 82.

24    [2] These facts are taken from the parties' Statements of Undisputed Facts, and responses thereto,
    unless otherwise cited.  *See* Doc. Nos. 61, 62-2, 67, 70-1, 71-1, 72-8, 73-2.  These facts are not
25   reasonably in dispute, unless otherwise noted.

26    [3] Goodrich Corporation (formerly BF Goodrich) acquired Rohr as a wholly-owned subsidiary
    in 1997.  Rohr is now referred to by Goodrich as "Goodrich Aerostructures."  *See Innovation and*
27   *History*, http://www.goodrich.com/Goodrich/Businesses/Aerostructures/Innovation-and-History (last
    visited Mar. 13, 2013).  Goodrich Aerostructures generally will be referred to herein as "Rohr."

28    [4] "Nacelles are the aerodynamic structures that surround aircraft engines."  *See* Dalen Decl'n
    ISO Rohr's MPSJ ("Dalen Decl'n"), Ex. 1.

1    Services.  Rohr and UPS-SCS entered into two separate contractual agreements that

2    are relevant to this dispute.  Both agreements were in effect at the time of the events

3    in question.

4                    ***The Subject Agreements Between Rohr and UPS-SCS***

5            On May 9, 2007, UPS-SCS and Goodrich, on behalf of its divisions,

6    subsidiaries, and affiliates, including Rohr, entered into a Master Services

7    Agreement ("MSA"), effective at the time of the events in question.  The MSA

8    provides that its terms apply to services rendered by UPS-SCS to Goodrich in

9    accordance with five Exhibits or Statements of Work attached to the MSA,

10   including International Air Freight Service (Ex. A), Small Package Transportation

11   Service (Ex. B), Trade Direct Service (Ex. C), Less Than Truckload Service (Ex.

12   D), and Importer Security Filing Services (Ex. E).

13           According to the terms of paragraph 11D of the MSA, UPS-SCS's maximum

14   liability for claims by Goodrich for loss or damage to cargo arising from UPS-SCS

15   providing "freight forwarding or motor broker Services, including arranging for

16   inland or air transportation, [is] $50 per shipment . . ."[5]  The MSA also provides that

17   UPS-SCS's maximum liability for loss or damage to cargo "arising from air, ground

18   or ocean transportation" is $0.50 per pound, unless set forth otherwise "in the bills

19   of lading, airway bills or other transportation documents issued in conjunction with

20   the Services."[6]

21           A Customs Brokerage Services Agreement ("CBSA") also exists between

22   UPS-SCS and Goodrich, by which UPS-SCS has agreed to act as a customs broker

23

24

25   —————————————

26       [5] The MSA is attached as an exhibit in support of both Rohr's and UPS-SCS's motions for partial summary judgment.  *See* Lindsay Decl'n ISO UPS-SCS's MPSJ ("Lindsay Decl'n"), Ex. 1; Dalen Decl'n, Ex. 5 (Vandergrift Depo., Ex. 1).

27

28       [6] Rohr does not challenge the correctness of these quotes from the MSA but disputes UPS-SCS's assertion that the MSA applies to the two shipments at issue.  *See* Rohr's Statement of Undisputed Facts ISO Response in Opp'n, Doc. No. 71-1 ¶¶ 5-8.

for Goodrich, assisting in the importation and exportation of cargo.[7]  According to the terms of the CBSA, in certain instances UPS-SCS will act on behalf of Goodrich, its divisions, subsidiaries, and affiliates, including Rohr, in arranging inland transportation of imported cargo.[8]  In furtherance thereof, the CBSA provides that UPS-SCS "shall prepare, and submit to carrier, inland bills of lading or pick-up delivery orders for prompt removal of merchandise from piers of cargo holding areas."  Pursuant to the CBSA, UPS-SCS is not liable for loss or damage to cargo when the cargo is "in the possession, custody, or control of third parties selected by [UPS-SCS]" for transportation.  Similar to the MSA, the CBSA limits UPS-SCS's liability for loss or damages to the lesser of $50 per shipment or the fees charged for UPS-SCS's services.

In conjunction with the CBSA, Goodrich provided UPS-SCS with a Customs Power of Attorney and Designation of Export Forwarding Agent ("Customs POA"). Pursuant to the terms of the Customs POA, Goodrich authorizes UPS-SCS and "its officers, employees, and specifically authorized agents to act for and on its behalf . . . full power and authority to do anything whatever requisite and necessary to be done in the premises as fully as said grantor could do if present and acting . . ."[9] The Customs POA incorporates the limitation of liability set forth in the CBSA.

### The First Shipment

On October 15, 2009, Vela Poe, Global Logistics Manager for Rohr, contacted Kathy Nicely, a Program Manager with UPS-SCS, via email, requesting a quote for the shipment of 787 GE Tooling equipment from Italy to Riverside,

---

[7] The CBSA is attached as an exhibit in support of both Rohr's and UPS-SCS's motions for partial summary judgment.  *See* Lindsay Decl'n, Ex. 2; Dalen Decl'n, Ex. 5 (Van der Tooren Depo., Ex. 2).

[8] Rohr does not dispute these terms, as provided in the CBSA, but disagrees with UPS-SCS's assertion that these terms affect UPS-SCS's liability for the subject damages.  *See* Doc. No. 71-1 ¶¶ 14-15.

[9] Rohr does not dispute the quoted terms of the Customs POS, but disagrees with UPS-SCS's characterization of the document.

California.  *See* Dalen Decl'n, Ex. 9 (email string referred to herein).  Nicely forwarded Poe's email to several individuals employed by UPS-SCS (Italy) in Milan, Italy.  Silvana Catalano, with the Italy Pricing Analyst Group at UPS-SCS (Italy), emailed Kathy on October 22, 2009 with a quote for the shipment of the cargo from the shipper/exporter's factory in Venegono Superiore, Italy to Los Angeles.  The quote was broken down into several constituent parts, including: loading and trucking cargo from Venegono to La Spezia, Italy; ocean freight from La Spezia to Los Angeles; export customs clearance; and related fees.  Rohr accepted the quote, with customs entry services to be performed separately by UPS-SCS's Customs Team.

UPS Europe SA, a non-vessel operating common carrier ("NVOCC"), filed the tariff for ocean transportation of the shipment.  UPS Europe SA arranged the transportation of the cargo from the factory in Italy to the Port of Long Beach and issued sea waybill no. 7141001703 ("Bill 1703") to cover that leg of the journey.[10] Bill 1703 designated Venegono Superiore as the "Place of Receipt" and Long Beach, California as the "Place of Delivery."  The cargo was described as consisting of three containers, including two standard 40' containers and one 40' flat rack, the latter for transporting two crates containing a bonding and trimming tool.[11]  Bill 1703 has a designated box on its face for declaring a value for cargo in excess of UPS-SCS's liability limitations.  This box was left blank.

Prior to the cargo being released at the port, UPS-SCS cleared the shipment through U.S. Customs.  UPS-SCS issued a Delivery Instruction to Knight Transportation, permitting Knight to pick up the cargo at the port terminal.  The

---

[10] A sea waybill is another term for a bill of lading.  *Hartford Fire Ins. Co. v. Novocargo U.S.A. Inc.*, 257 F. Supp. 2d 665, 668 n.1 (S.D.N.Y. 2003), citing *Jessica Howard Ltd. v. Norfolk S. R.R. Co.*, 316 F.3d 165, 169 n.1 (2d Cir. 2003).

[11] "Cargo which cannot be placed in a standard container due to being too tall or too wide is typically transported on an ocean container called a flat rack.  A flat rack is a container with a metal base and no walls to permit oversized cargo to be loaded on the flat rack for transit."  *See* UPS-SCS Statement of Undisputed Facts, Doc. No. 61 ¶ 31.

Delivery Instruction identified the three containers, including the two crates being transported on the 40' flat rack.

On December 3, 2009, Jose Martinez, a driver for Knight, arrived at the port and located the cargo on the 40' flat rack situated on a standard container chassis. Martinez did not measure the height of the cargo as it sat on the chassis and flat rack to determine if it was within the legal limit to transport on a public highway in California. Martinez did not know the maximum allowable height. During the inland transportation from the port to Riverside, California, Martinez attempted to travel under a bridge posted for clearance of 14'9". The cargo measured more than 15' above the roadway. As a result, the cargo struck the overpass and was damaged.

### *The Second Shipment*

Rohr requested a second quote from UPS-SCS for the shipment of two crates containing bonding tools, identical to those included in the first shipment but slightly taller. UPS Europe SA issued sea waybill no. 7141002550 ("Bill 2550") to cover transportation of the cargo from Italy to the Port of Long Beach. Similar to Bill 1703, Bill 2550 has a designated box on its face for declaring a value for cargo in excess of UPS-SCS's liability limitations. This box was left blank.

Prior to the cargo being released at the port, UPS-SCS cleared the shipment through U.S. Customs. UPS Ocean Freight Services endeavored to appoint a local trucker to transport the cargo inland. To avoid a repeat of the accident with the first shipment, Rohr requested that the appointed company have a "low boy" or similar trailer which would allow the cargo to sit lower during transit than on a standard chassis. The inland transportation job was offered to CAL Modal. UPS-SCS issued a Delivery Instruction to CAL Modal which indicated "***SPECIAL EQUIPMENT NEEDED*** FRT IS ON A 40' FLAT RACK." When CAL Modal received the Delivery Instruction, CAL Modal advised UPS-SCS that it did not have the special equipment needed and the arrangement was cancelled.

UPS-SCS appointed Look Transportation in place of CAL Modal. However,

1  CAL Modal dispatched a driver to pick up the cargo at the port.  The CAL Modal

2  driver arrived at the port before the Look driver and exited the port with the cargo

3  on a standard chassis.  Because the cargo was in excess of the maximum allowable

4  height limitation in California, the cargo struck a bridge during inland transit and

5  was damaged.

6       Each damaged shipment weighed 31,967 pounds.  Rohr presented a claim for

7  the damaged cargo to its cargo insurance company and received payment for each of

8  the two shipments.[12]

9                        **SUMMARY JUDGMENT STANDARD**

10      Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary

11  judgment "if the pleadings, depositions, answers to interrogatories, and admissions

12  on file, together with the affidavits, if any, show that there is no genuine issue as to

13  any material fact and that the moving party is entitled to a judgment as a matter of

14  law." *Hubbard v. 7-Eleven*, 433 F. Supp. 2d 1134, 1139 (S.D. Cal. 2006), citing

15  former Fed. R. Civ. P. 56(c)(2).  "The moving party bears the initial burden to

16  demonstrate the absence of any genuine issue of material fact." *Horphag Research*

17  *Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted).  "Once the

18  moving party meets its initial burden, . . . the burden shifts to the nonmoving party

19  to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing

20  that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S.

21  242, 248 (1986) (internal quotation marks and citations omitted).

22      A mere scintilla of evidence is not sufficient "to defeat a properly supported

23  motion for summary judgment; instead, the nonmoving party must introduce some

24  'significant probative evidence tending to support the complaint.'" *Fazio v. City &*

25  *County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997), quoting *Anderson*,

26  477 U.S. at 249, 252.  Thus, in opposing a summary judgment motion, it is not

27

28       [12] Rohr's insurer, CNA Insurance, brings this action in Rohr's name for subrogation recovery. *See* UPS-SCS's Memo. ISO MPSJ, Doc. No. 61 at 4.

enough to simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).  However, when assessing the record to determine whether there is a "genuine issue for trial," the court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in his favor." *Horphag*, 475 F.3d at 1035 (citation omitted).  On summary judgment, the Court may not make credibility determinations; nor may it weigh conflicting evidence. *See Anderson*, 477 U.S. at 255.  Thus, as framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

## THE CARMACK AMENDMENT

In 1906, Congress enacted the Carmack Amendment to the Interstate Commerce Act ("Carmack"), 49 U.S.C. § 14706, with the purpose of "reliev[ing] shippers of the burden of searching out a particular negligent carrier from among the numerous carriers handling an interstate shipment of goods." *Reider v. Thompson*, 339 U.S. 113, 119 (1950).  Carmack "subjects common carriers and freight forwarders transporting cargo in interstate commerce to absolute liability for actual loss or injury to property." *Ins. Co. of N. Am. v. NNR Aircargo Serv. (USA)*, Inc., 201 F.3d 1111, 1115 (9th Cir. 2000), citing 49 U.S.C. § 14706(a).  The statute serves as a shipper's exclusive remedy for damaged property and preempts common law causes of action against such "carriers" and "freight forwarders." *Hughes Aircraft Co. v. N. Am. Van Lines, Inc*., 970 F.2d 609, 613 (9th Cir. 1992). Carmack does not apply to "brokers," defined under 49 U.S.C. §13102(2) as "a person, other than a motor carrier . . . that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." *Id*. at 1068-69.

## UPS-SCS's Motion for Partial Summary Judgment

UPS-SCS moves for partial summary judgment against Rohr, arguing that its liability for damages to cargo during the subject shipments, if any, is contractually limited to either $50.00 per shipment or $0.50 per pound. UPS-SCS directs the Court to pertinent provisions in both the MSA and CBSA. Both contracts contain limitations of liability, as discussed above. UPS-SCS contends that in each instance, the limitation provisions were freely negotiated with Rohr and are valid under both Carmack and federal common law.

Rohr argues that neither the MSA nor the CBSA cover the subject shipments.[13] According to Rohr, the five services to be performed by UPS-SCS under the terms of the MSA do not include ocean transportation. As such, the MSA's liability limitation is inapplicable. Rohr further asserts that the limitation on UPS-SCS's liability set forth in the CBSA is irrelevant because UPS-SCS was not acting as a customs broker. Rohr argues that UPS-SCS acted as a freight forwarder and/or motor carrier when arranging the two shipments of cargo, and therefore Carmack applies here.[14] Rohr contends that under Carmack the liability limitations in the MSA and CBSA are not valid.

### *Master Services Agreement*

Paragraph 11D of the MSA limits UPS-SCS's liability to Rohr for loss or damage to goods to a maximum of $50 per shipment, if UPS-SCS provides freight forwarding or motor broker services, including "arranging for inland or air transportation." *See* Lindsay Decl'n, Ex. 1. If UPS-SCS provides air, ground, or ocean transportation services, liability is limited according to the terms and

---

[13] Rohr cross-moves for summary judgment on this issue and requests that the Court find as a matter of law that neither the MSA nor the CBSA limit UPS-SCS's liability, if any, for the subject losses. *See* Doc. No. 62-1 at 18. Rohr's summary judgment motion is discussed in detail *infra*.

[14] Both parties include substantial argument in their memoranda regarding the classification of UPS-SCS's role with respect to the two subject shipments. Although the classification of UPS-SCS's role as a motor carrier, freight forwarder, or broker will determine whether Carmack applies, that determination is not germane to whether UPS-SCS's liability, if any, is contractually limited.

conditions set forth in the issued bill of lading, airway bill, or "other transportation document." *Id*. If a bill of lading or other transportation document issued for ground transportation services does not include any liability limit, the MSA limits UPS-SCS's liability to $0.50 per pound. *Id*.

The terms and conditions of the MSA do not limit UPS-SCS's potential liability to Rohr in this case, however, unless a threshold condition is met: with respect to the subject shipments, UPS-SCS must have performed one or more of the services set forth in the five Exhibits to the MSA.[15] UPS-SCS's position on this issue is a bit amorphous. In its Statement of Undisputed Facts, UPS-SCS states:

> UPS-SCS required the inclusion of paragraph 11D and its reference to ocean transportation in its liability limitation provision in the event Goodrich requested UPS-SCS *provide service outside the services described in the Exhibits to the MSA where, as here, there was not another Exhibit attached to the MSA which described the specific services* requested by Goodrich for a particular requested transportation of cargo.

*See* Doc. No. 61 at 6, ¶10 (emphasis added). Despite this apparent admission that the services related to the subject shipments fall outside the parameters of the Exhibits to the MSA, UPS-SCS maintains that those services are covered by the MSA because the services relate to ocean imports. In turn, the terms set forth in Exhibit E, Importer Security Filing ("ISF") services, are applicable to ocean imports.[16] ISF services are only needed for goods being imported into the United States via ocean transportation.[17] Thus, UPS-SCS argues that Exhibit E and the

---

[15] Paragraph 1A provides that UPS-SCS, "or its designated affiliate, will perform the Services specified in the Exhibits referencing this MSA and executed by the Parties. Each Exhibit may have attached one or more statements of work ("SOWs") and appendices ("Appendix"). Each such Exhibit, SOW, and Appendix is an "Incorporated Document." This MSA and the Incorporated Documents are the "Agreement."" *See* Lindsay Decl'n, Ex. 1.

[16] It appears to be undisputed that UPS-SCS did not perform any of the services set forth in Exhibits A-D of the MSA, in relation to the subject shipments.

[17] UPS-SCS offers the Declaration of Eva Yablonsky in support of this position. *See* Doc. No. 61-1. Rohr argues that the Court should strike the Yablonsky Declaration because Ms. Yablonsky lacks personal knowledge of the MSA negotiations, attempts to interpret the terms of the MSA, and relies on inadmissible hearsay. *See* Doc. No. 71 at 22-23. The Court finds that the declaration should not be stricken from the record. However, to the extent Rohr objects to paragraphs 8, 9, and 11 of the

11cv617

1   MSA clearly *contemplate* the provision of services related to ocean imports, so that

2   the liability limitation of the MSA applies to the subject shipments.

3      Rohr responds that none of the Exhibits to the MSA cover the services

4   provided by UPS-SCS in relation to the two shipments of cargo.  Rohr points out

5   that while Exhibit E applies to ISF services for the importation of goods into the

6   United States by ocean, it does not cover the actual transportation of such goods.

7      The Court agrees with Rohr that the services provided by UPS-SCS in

8   relation to the subject shipments are not described in any of the Exhibits to the

9   MSA.  And there is no evidence in the record that UPS-SCS provided ISF services

10  to Rohr in connection with either shipment.  The price quotes from UPS-SCS,

11  accepted by Rohr, do not include ISF services or related fees.  Appendix A to

12  Exhibit E contains a schedule of such fees.  There is no documentation in the record

13  demonstrating that Rohr paid any of these fees to UPS-SCS for the subject

14  shipments.

15     Exhibit E contains its own limitation of liability in paragraph 4.3, such that

16  "[i]n connection with all services performed by the Company [UPS-SCS], the

17  Company's liability shall be limited to $50.00 per importer security filing or

18  transaction, or the amount of fees paid to the Company for the importer security

19  filing or transaction, whichever is more."  In order for the MSA to apply to the

20  subject shipments, UPS-SCS had to provide services set forth in one or more of the

21  Exhibits.  If UPS-SCS had provided any ISF services per Exhibit E to Rohr for the

22  subject shipments, the terms of Exhibit E would have controlled UPS-SCS's

23  liability.  The Exhibit E liability clause conflicts with paragraph 11D of the MSA,

24  and by its own terms, Exhibit E controls in the event of a conflict.  Yet UPS-SCS

25  does not argue that its liability in this case should be limited to $50 per importer

26  security filing or transaction, or the related amount of fees; UPS-SCS steadfastly

27

28  declaration as impermissible contract interpretation, the Court sustains the objection and does not
    consider those portions of Ms. Yablonsky's declaration.

1 urges that its liability, if any, is limited to $50 per shipment, or $0.50 per pound.

2 UPS-SCS's reliance on paragraph 11D is reconcilable with the express terms of

3 Exhibit E only if no ISF services were performed, or in the alternative, if any loss or

4 damage to the goods resulted from other services.  In either event, Exhibit E would

5 be inapplicable.  However, any services outside the parameters of Exhibit E would

6 have to be covered by one of the other Exhibits in order for the MSA (and

7 paragraph 11D) to apply.  It is undisputed that the services provided to Rohr with

8 respect to the two shipments are not covered by any of the other Exhibits.

9        Finally, the Court notes that Exhibit E was entered into and went into effect

10 on October 15, 2009, the same day that Rohr initially contacted UPS-SCS for a

11 price quote for the first shipment.  The ensuing week-long chain of email

12 communications does not indicate that either party contemplated UPS-SCS

13 providing ISF services for Rohr in connection with the shipment.  Indeed, the ISF

14 regulations, although implemented on January 26, 2009, were subject to a delayed

15 enforcement period of twelve months.  *See* 19 C.F.R. § 149.2 ("ISF Importers must

16 comply with the requirements of this section on and after January 26, 2010.").  The

17 delayed enforcement period likely explains in part why UPS-SCS did not enter into

18 an ISF services agreement with Rohr until October 2009, 10 months after the

19 regulations were implemented, and why neither quote included any ISF service fees.

20        In sum, the Court finds that the MSA does not limit UPS-SCS's liability, if

21 any, with respect to the subject shipments.  Accordingly, the Court **DENIES IN**

22 **PART** UPS-SCS's motion for partial summary judgment.

23                        *Customs Brokerage Services Agreement*

24        UPS-SCS argues that the CBSA applies to limit its liability in this case

25 because it acted solely as a customs broker for the subject shipments.  Rohr

26 acknowledges that UPS-SCS arranged for the cargo in both shipments to clear

27 customs upon arrival in the United States, but asserts that in relation to the inland

28 transportation of the cargo, UPS-SCS acted beyond the limited capacity of a

customs broker, as a freight forwarder or motor carrier.  As such, Rohr argues that UPS-SCS's liability for damage to the cargo is not limited by the terms of the CBSA.

Paragraph 10 of the CBSA (Indemnification and Limitation of Liability) provides:

> Except as otherwise provided in this Agreement, or any Appendix thereof, and except if such injury is due to Goodrich's or its agent's negligence, Company [UPS-SCS] shall indemnify and hold GOODRICH harmless against all losses to the extent caused by personal injury or property damage arising solely from any negligent act or omission of Company, its agents, employees, and sub-contractors.  This section does not apply to losses arising from cargo loss, damage or delay, which is subject to the cargo handler or transportation provider's terms and conditions thereof or other contract entered by Goodrich for such services.

*See* Lindsay Decl'n, Ex. 2.  Appendix IV to the CBSA sets forth the terms and conditions of UPS-SCS's services under the agreement, and contains several limitations on UPS-SCS's potential liability when acting as a customs broker. Paragraph 8 limits UPS-SCS's liability "for any loss, damage, expense or delay to the goods resulting from the negligence or other fault of the Company" to a maximum of $50.00 per shipment.  *Id*.

Paragraph 1 of Appendix IV (Services by Third Parties) explains that the limits set forth in paragraph 8 apply in the event UPS-SCS "carries, stores or otherwise physically handles" a shipment.  Otherwise, UPS-SCS "assumes no liability as a carrier," "but undertakes only to use reasonable care in the selection of carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehousemen and others to whom it may entrust the goods for transportation, cartage, handling and/or delivery and/or storage or otherwise."  *Id*.  Likewise, paragraph 2 of Appendix IV (Liability Limitations of Third Parties) states that UPS-SCS "shall under no circumstances be liable for any loss, damage, expense or delay to the goods for any reason whatsoever when said goods are in custody, possession or control of third parties selected by the Company to forward, enter and clear, transport or render other services with respect to such goods."  *Id*.

When UPS-SCS acts as a customs broker for Rohr, the terms and conditions of the CBSA apply.[18]  If UPS-SCS is found to have acted solely as a customs broker with respect to the subject shipments in this case, the CBSA will limit its liability accordingly.[19]

Based on the foregoing, the Court **GRANTS IN PART** UPS-SCS's motion for partial summary judgment.

### KNIGHT'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

Knight has filed a "renewed" motion for partial summary judgment against Rohr, arguing that its liability for damages to cargo during the first shipment is limited to $500.00 per package pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1304(5).  These are the same grounds upon which Knight moved for partial summary judgment previously.  Knight's argument once again hinges on its interpretation of Bill 1703, issued by UPS Europe SA, as the contract of carriage for the first shipment of cargo from Italy to Southern California.  According to Knight, Bill 1703 is a "through" bill of lading.[20]

Knight presents the July 26, 2012 deposition testimony of UPS-SCS's expert Karen West as purportedly new evidence in support of this interpretation.  Knight

---

[18] Rohr argues that even if the Court finds the CBSA applicable, paragraph 10 of the CBSA requires UPS-SCS to indemnify Rohr for damage to the cargo.  Rohr ignores the first sentence of the paragraph, however, which indicates that its provisions are excepted by any set forth in Appendix IV.

[19] UPS-SCS and Rohr seek a ruling as to the validity of the CBSA's liability limitations.  UPS-SCS argues that the relevant provisions are valid and enforceable pursuant to federal common law.  Rohr asserts that federal common law does not apply, and the provisions must be found invalid under California state law which prohibits UPS-SCS from limiting its liability for gross negligence.  Rohr cites California Civil Code § 2175, which provides that a "common carrier" cannot contractually exonerate itself from liability with respect to gross negligence, fraud, or other wrong acts.  *See* Doc. No. 74 at 8 (citing Cal. Civ. Code § 2175).  However, if UPS-SCS is found to have acted as a customs broker in relation to the two shipments then California's statutory scheme for liability as to common carriers does not apply.  *See Chubb Group of Ins. Cos. v. H.A. Transp. Sys.*, 243 F. Supp. 2d 1064, 1073 (C.D. Cal. 2002).  Furthermore, paragraph 17F of the CBSA expressly provides that "[a]ll questions concerning the validity and operation of this Agreement . . . shall be governed by the laws of the State of Ohio."  *See* Lindsay Decl'n., Ex. 2.  Neither party addresses this provision nor provides sufficient evidence to support their position on the issue.  Therefore, the Court cannot determine on the basis of the current record whether the CBSA's liability limitations are valid.

[20] "Through" bills of lading specifically cover both oceanic and inland legs of a journey in a single document.  *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25-26 (2004).

1   claims that Ms. West testified during deposition that Bill 1703 is a "through" bill of

2   lading.  As such, Knight contends that the terms and conditions of Bill 1703 apply

3   to both the oceanic and inland legs of the first shipment.  Among these terms and

4   conditions is a limitation of the carrier's liability to "$500 per package, or for Goods

5   not shipped in packages, per customary freight unit."[21]  The terms and conditions

6   also include a Himalaya Clause [22] extending the benefit of this liability limitation to

7   "downstream parties expected to take part in the contract's execution," including

8   subcontractors and participating land carriers.[23]  *Norfolk Southern Ry. v. James N.*

9   *Kirby, Pty Ltd.*, 543 U.S. 14, 20 (2004).  As such a party, Knight argues that it

10  enjoys the benefit of the $500 limitation on its liability for damages to cargo during

11  the first shipment.

12        Rohr opposes the motion on both procedural and substantive grounds.  Rohr

13  argues that regardless of how Knight has styled the current motion, Knight

14  effectively seeks reconsideration of the Court's denial of its previous motion for

15  partial summary judgment.  Rohr asserts that because Knight has not satisfied any of

16  the grounds for reconsideration set forth in Federal Rule of Civil Procedure 60(b),

17  the Court must deny relief.  Rohr also challenges the merits of Knight's motion.

18  According to Rohr, Bill 1703 is properly classified as a "port to port" bill of lading.

19  As a result, the terms and conditions of Bill 1703 do not extend to Knight, and it

20

21      [21] The Terms and Conditions of Bill 1703 are attached as Exhibit 1 to Knight's Amended
    Separate Statement of Material Facts and Exhibit 1 to the Dalen Declaration in support of Rohr's
    Opposition to Knight's motion.  *See* Doc. Nos. 67, 70-3.

22

23      [22] "Clauses extending liability limitations take their name from an English case involving a
    steamship called *Himalaya*."  *Norfolk Southern Ry.*, 543 U.S. at 20, citing *Adler v Dickson*, [1955] 1
    Q. B. 158 (C. A.).

24

25      [23] Section 6.3 of the applicable "Multimodal Transport or Port to Port Shipment Conditions"
    provides: "In the event a claim or suit is brought against anyone participating in the performance of
26  the Carriage other than Carrier, that party is entitled to all exceptions, exemptions. defenses,
    immunities, limitations of liability, privileges and conditions granted or provided by this document,
27  any applicable Tariff. and any law governing it or incorporated by reference into it as if the protected
    party were a party to this document. These protected parties include, but are not limited to,
28  Subcontractors, stevedores. terminals, watching services, participating land, air, or sea carriers and
    their direct or indirect subcontractors. Each of these parties is a third party beneficiary of this
    document."  *See* Knight Ex. 1.

1   cannot claim third party beneficiary status under the contract of carriage.[24]  Rohr

2   argues that Knight misstates Ms. West's deposition testimony, and as such, this

3   additional evidence requires no deviation from the Court's previous ruling denying

4   Knight's motion for partial summary judgment.

5        Knight moves for relief on grounds identical to those raised in its original

6   motion.  The Court has already considered and ruled on the arguments and issues

7   set forth in Knight's current motion.  The addition of Ms. West's deposition

8   testimony as supporting evidence is the only difference between the motions.  As

9   such, the Court construes the current motion as a request for reconsideration of its

10   previous ruling denying relief on the basis of newly presented evidence.[25]

11                     ***Legal Standard***

12        "[A] motion for reconsideration should not be granted, absent highly unusual

13   circumstances, unless the district court is presented with newly discovered

14   evidence, committed clear error, or if there is an intervening change in the

15   controlling law."  *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th

16   Cir. 1999) (citation omitted).  Motions for reconsideration are "not designed merely

17   to provide a dissatisfied litigant with additional opportunity to sway the Court."

18   *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 282 F.R.D.

19   216, 232, 2012 U.S. Dist. LEXIS 45794 (D. Ariz. March 30, 2012); *Khan v.*

20   *Fasano*, 194 F. Supp. 2d 1134, 1136 (S.D.Cal. 2001) ("A party cannot have relief

21   under this rule merely because he or she is unhappy with the judgment.").

22                      ***Discussion***

23        Knight does not contend that the Court clearly erred, nor does it identify a

24   _____

25      [24] The case docket reflects that Knight did not file a reply brief in response to Rohr's opposition to its motion.

26      [25] The Court issued its ruling denying Knight's previous motion for partial summary judgment

27   on June 4, 2012.  *See* Doc. No. 60.  Knight filed the instant motion on July 31, 2012.  *See* Doc. No. 64.  The Court notes that Knight's motion was not timely filed, regardless of the construction.  As noted *supra*, the deadline for filing a summary judgment motion was June 15, 2012.  Pursuant to Civil

28   Local Rule 7.1.i.2, a motion for reconsideration must be filed within twenty-eight (28) days after entry of the order sought to be reconsidered.

1    change in the controlling law.  Rather, Knight submits Ms. West's deposition

2    testimony as new evidence compelling the Court to reverse its previous ruling.

3    Evidence is not "newly discovered" if at the time of summary judgment it "could

4    have been discovered with reasonable diligence." *Wallis v. J.R. Simplot Co.*, 26

5    F.3d 885, 892 n. 6 (9th Cir. 1994); *see* Fed. R. Civ. P. 60(b)(2), (c)(1).  Here, Knight

6    could have obtained Ms. West's testimony prior to moving for partial summary

7    judgment if it had exercised reasonable diligence in doing so, or had merely waited

8    until after the completion of expert discovery to file its motion.  Therefore, Ms.

9    West's deposition testimony is not "newly discovered evidence" for purposes of a

10   motion for reconsideration.  *Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764

11   F.2d 604, 609 (9th Cir. 1985).

12         Even if the Court considers the evidence, Knight's motion is without merit.

13   Ms. West's deposition testimony does not establish beyond dispute that Bill 1703 is

14   a "through" bill of lading intended to cover both the oceanic and inland legs of the

15   first shipment of cargo.  When asked whether she considered Bill 1703 to be a

16   through bill of lading, Ms. West responded, "[n]ot through to door but through to

17   port."  *See Dalen Decl'n*, Ex. 17 (West Depo. at 141).  Ms. West further indicated

18   that although UPS-SCS's price quote to Rohr included the cost of inland

19   transportation, Bill 1703 (referred to during her deposition intermittently as the

20   "ocean bill of lading") ended at the Port of Long Beach.  *Id*. (West Depo. at 140).

21         In sum, Karen West's deposition testimony does not support Knight's

22   assertion that UPS-SCS issued a through bill of lading extending its liability

23   limitations to Knight as a third party beneficiary under COGSA.  The proffered

24   testimony actually suggests the opposite, and it certainly does not entitle Knight to a

25   revised ruling in its favor.  Accordingly, the Court **DENIES** Knight's motion.

26                  **ROHR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

27         Rohr moves for partial summary judgment against UPS-SCS and Knight as to

28   the following issues: (1) whether UPS-SCS is strictly liable for damages to cargo

1   during the subject shipments pursuant to Carmack; (2) whether Knight is strictly

2   liable for damages to cargo during the first shipment pursuant to Carmack; and (3)

3   whether liability for damages to cargo during the subject shipments is contractually

4   limited.

5                       ***UPS-SCS's Liability Under Carmack***

6         Rohr moves for summary judgment as to UPS-SCS's liability under Carmack.

7   Rohr argues that UPS-SCS acted as a carrier and/or freight forwarder with respect to

8   the shipments in dispute, and is subject to Carmack's statutory scheme of liability

9   for damage to cargo during inland transportation.[26]  UPS-SCS contends that it has

10  no liability under Carmack.  In arranging the logistics of the two shipments in

11  question, UPS-SCS argues that it acted as a customs broker only and therefore

12  liability under Carmack does not attach.[27]

13        First, Rohr argues that UPS-SCS acted as a motor carrier with respect to both

14  shipments.  Under Carmack, a carrier is defined as "a motor carrier, a water carrier,

15  and a freight forwarder."  49 U.S.C. § 13102(3).  A "motor carrier" is a "person

16  providing commercial motor vehicle transportation for compensation."  *Id*. §

17  13102(14).  Carmack requires carriers to issue a receipt or bill of lading for property

18  received for transportation, and holds carriers liable for actual loss or injury to the

19  property resulting from the transportation thereof in claims arising out of the receipt

20

21        [26] While Carmack does not apply to brokers, it does not preempt state law claims against
22  brokers.  *Commercial Union Ins. Co. v. Forward Air, Inc.*, 50 F. Supp. 2d 255, 257 (S.D.N.Y. 1999)
     ("In short, this case requires the court to decide whether the Carmack Amendment, in omitting
23  reference to the liability of brokers for damage to shipped goods, intended to afford brokers total
     immunity from such a suit.  The Court concludes that the Carmack Amendment does not bar suits
24  against brokers.").  Accordingly, if UPS-SCS is a carrier or freight forwarder, it is subject to liability
     under Carmack.  As a broker, however, UPS-SCS would not be subject to liability under Carmack,
25  and Rohr will have to seek relief through its negligence claims.

26        [27] In its opposition brief, UPS-SCS asserts that it acted as a customs broker in relation to the
     subject shipments and argues that "[u]nder the undisputed facts, Carmack does not apply to UPS-SCS
27  as it was not a freight forwarder or motor carrier and is not liable under 49 U.S.C. § 14706."  *See* Doc.
     No. 72 at 19.  However, UPS-SCS did not move for summary judgment on this issue.  In fact, UPS-
28  SCS states in its reply brief in support of its own motion for partial summary judgment that "the
     determination of the capacity in which UPS-SCS acted is a question of fact for the trier of fact."  *See*
     Doc. No. 73 at 3.

or bill of lading.  49 U.S.C. § 14706(a)(1); *Babcock & Wilcox Co. v. Kansas City S. Ry. Co.*, 557 F.3d 134, 137 (3d Cir. 2009).  Rohr argues that the Delivery Instructions issued by UPS-SCS to Knight and CAL Modal/Look qualify as receipts or bills of lading for the inland transportation of the cargo; because UPS-SCS issued these documents, it is subject to liability as a carrier.

Secondly, Rohr argues "additionally, or alternatively," that UPS-SCS acted as a freight forwarder in relation to the subject shipments. *See* Doc. No. 62-1 at 15.  A "freight forwarder" is defined by statute as:

> a person holding itself out to the general public . . . to provide transportation of property for compensation and in the ordinary course of its business (A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments; (B) assumes responsibility for the transportation from the place of receipt to the place of destination; and (C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

49 U.S.C. § 13102(8).  Rohr asserts that UPS-SCS holds itself out to the general public as a freight forwarder; it assumed responsibility for the "door to door" transportation of the damaged cargo; it used motor carriers for the inland transportation of the shipments; and, while it did not assemble, consolidate, or provide break-bulk for the two shipments, UPS-SCS routinely performs these services on other occasions.

UPS-SCS, on the other hand, puts forth evidence that it was acting as a broker.  A broker is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."  49 U.S.C. § 13102(2).

The Court cannot resolve as a matter of law whether UPS-SCS acted as a motor carrier, freight forwarder, or broker.  According to Rohr, UPS-SCS held itself out as providing "door to door" transportation for the shipments, including

transportation to the final inland destination.  *See, e.g.*, Dalen Decl'n, Ex. 9 (Nicely email with subject header "FW: Logistics for 787 GE Tooling - OCEAN EXPORT MIL–LAX (door Riverside, CA)").  The price quote for the first shipment, provided to Rohr by the Italy pricing group of UPS-SCS, indicated "door to door" origin and destination.  *See* Dalen Decl'n, Ex. 11.  "Door to door" delivery included an inland leg with transportation by motor carrier, and UPS-SCS issued the relevant delivery instructions to the hired trucking services.  Thus, Rohr argues that UPS-SCS acted as a motor carrier.  *See* 49 U.S.C. § 14706(a)(1).  But, as UPS-SCS points out, it did not issue separate bills of lading for the inland transit of the cargo.  Bills 1703 and 2550 were for "port to port shipments" and clearly stated the "final destination" of each shipment of cargo as "door to CY [container yard]."[28]  And, the price quote for the second shipment indicated "port to port" as the origin and destination. *See* Dalen Decl'n, Ex. 11.

Furthermore, Rohr's own designated expert, Terry Morgan, testified during deposition that UPS-SCS was not acting as a motor carrier in the movement of either of the two shipments inland from the port.[29]  *Morgan Depo* at 47-48.  Morgan opined that UPS-SCS acted as a freight forwarder and described the delivery instructions issued by UPS-SCS for the inland portions of the shipments as "receipts."  *Id.* at 78.  Under Carmack, "[w]ith the consent of the freight forwarder, a motor carrier may deliver property for a freight forwarder on the freight forwarder's bill of lading, freight bill, or shipping receipt to the consignee named in it, and receipt for the property may be made on the freight forwarder's delivery receipt."  49 U.S.C. § 14706(a)(2).  UPS-SCS argues that the delivery instructions

---

[28] However, UPS Europe SA – not UPS-SCS – issued the waybills, which arguably covered only the oceanic legs of the shipments, as Rohr notes in opposition to Knight's renewed motion for partial summary judgment.  *See* Dalen Decl'n, Ex. 12 (Nicely Depo. at 50); *see also* Doc. No. 70 at 12.

[29] The Morgan Deposition is attached as Exhibit 33 to the Declaration of Bruce Lindsay in support of UPS-SCS's opposition to Rohr's motion for partial summary judgment and as Exhibit 2 to the Declaration of Lauren Komsa in support of Rohr's reply to UPS-SCS's opposition.  *See* Doc. Nos. 72-5; 74-2.

were in fact just that – delivery instructions.  In addition, because it did not assemble or consolidate freight, or provide break-bulk in connection to either shipment, UPS-SCS contends that its services do not satisfy the statutory definition of freight forwarding.  *See* 49 U.S.C. § 13102(8).

According to UPS-SCS, it acted as a broker with respect to the subject shipments.  The services provided to Rohr with respect to both shipments included customs brokerage, as indicated in the price quotes.  *See* Lindsay Decl'n, Ex. 4.  As Rohr's broker, UPS-SCS had the authority to hire motor carriers to transport cargo from the port to its final inland destination, which it exercised when it hired Knight and Look.  The work statement attached as Appendix I to the CBSA anticipates that UPS-SCS would provide such services when acting as a customs broker. *See* Lindsay Decl'n, Ex. 1.  For example, paragraph N of section 5 (Scope of Work) states: "Company shall prepare, and submit to carrier, inland bills of lading or pick-up delivery orders for prompt removal of merchandise from piers or cargo holding areas."  Paragraph O of section 5 provides, in pertinent part: "Company shall monitor inland carriers to ensure timely pick-up and delivery, and shall promptly notify the Goodrich Division which is the importer of record of any delays." Following clearance of the cargo through U.S. Customs, UPS-SCS issued delivery instructions to the trucking services in accordance with the terms and conditions of the CBSA work statement.

In addition, UPS-SCS offers the testimony of expert Karen West, who opined during deposition that UPS-SCS acted as a broker.  *See* Lindsay Decl'n, Ex. 35. UPS-SCS also attaches a bill of lading issued by CAL Modal with respect to the inland drayage of the second shipment.[30]  The bill of lading lists UPS-SCS as the "broker" and references Bill 2550.  The terms and conditions of the bill of lading state that CAL Modal is a "motor carrier."  In response, Rohr points out the CAL

---

[30] The CAL Modal bill of lading is attached as Exhibit 1 to the Declaration of Bruce Lindsay in support of UPS-SCS's sur-reply in response to Rohr's reply.  *See* Doc. No. 75-3.

1  Modal's bill of lading was never issued, since UPS-SCS cancelled its arrangement

2  with CAL Modal for the inland delivery of the second shipment.

3      The preceding discussion highlights only some of the numerous factual

4  disputes that prevent the Court from determining whether UPS-SCS acted as a

5  motor carrier, freight forwarder, or broker, on the basis of the current record.[31]  The

6  issue, ultimately, is one for the trier of fact.  Accordingly, the Court **DENIES**

7  Rohr's motion for partial summary judgment as to UPS-SCS's liability under

8  Carmack.

9      Rohr also requests the Court find as a matter of law that UPS-SCS did not

10  successfully limit its liability for the damages sustained by the subject cargo.  As

11  discussed in detail above, the Court finds that UPS-SCS fails to establish that its

12  liability is limited by the MSA, the terms and conditions of which are inapplicable

13  to the subject shipments.  Accordingly, the Court **GRANTS IN PART** Rohr's

14  motion for partial summary judgment as to this narrow issue.  However, if a trier of

15  fact eventually finds that UPS-SCS acted as a customs broker with respect to both

16  shipments, UPS-SCS's liability will be limited pursuant to the terms and conditions

17  of the CBSA.

18              ***Knight's Liability Under Carmack***

19      Rohr also moves for summary judgment as to Knight's liability under

20  Carmack.  Rohr contends that the following facts are undisputed: (1) Knight acted

21  as a motor carrier with respect to the first shipment; (2) the cargo was delivered to

22

23      [31] Other courts have denied summary judgment where there are issues of fact as to whether an entity performed the services of a carrier or broker. *See, e.g.*, *Consol. Freightways Corp. of Del. v. Travelers Ins. Co.*, 2003 U.S. Dist. LEXIS 26984, 2003 WL 22159468, at *6 (N.D. Cal. Mar. 28, 2003) (finding summary judgment inappropriate because triable issues of fact remained as to whether trade show producer was a carrier or a broker); *Hewlett-Packard Co. v. Brother's Trucking Enterprises, Inc.*, 373 F. Supp. 2d 1349, 1352 (S.D. Fla. 2005) (denying summary judgment because reasonable fact finder could find that the defendant acted as either a motor carrier or a broker where the defendant both arranged for transportation and also exerted some measure of control over the drivers); *Just Take Action, Inc. v. GST (Americas) Inc.*, 2005 U.S. Dist. LEXIS 8432, 2005 WL 1080597, at *5 (D. Minn. May 6, 2005) (denying summary judgment because triable issues of fact existed as to whether the defendant played "the role of broker or motor carrier" when it arranged for transportation with a separate motor carrier but also "drafted the bill of lading and directed how the shipment would take place").

1    Knight in good condition, but redelivered by Knight damaged; and (3) the damage

2    occurred while Knight was in possession, custody, and control of the cargo.  Rohr

3    also requests the Court find as a matter of law that Knight's liability for damages to

4    the first shipment of cargo is not limited by the terms and conditions referenced on

5    UPS-SCS's delivery instructions and invoices.

6         Knight refers the Court to the arguments and evidence in support of its

7    renewed motion for partial summary judgment.[32]  Knight does not dispute that the

8    subject cargo was damaged in a motor vehicle accident while it was being

9    transported by Knight.  However, Knight disputes Rohr's contention that Carmack

10   applies to the inland drayage of the cargo.  As discussed above, Knight contends

11   that COGSA, not Carmack, provides the applicable statutory scheme of liability,

12   and its liability is limited under COGSA by the terms and conditions of Bill 1703.

13        As Rohr notes in its opposition to Knight's motion, the Court previously held

14   that genuine issues of fact preclude a finding that COGSA applies to limit Knight's

15   liability in this case.  Consistent with the finding that Knight fails to set forth

16   sufficient grounds for reconsideration of this previous ruling, the Court declines to

17   hold otherwise on the basis of the current record.  Knight cannot be found liable

18   under Carmack if the trier of fact ultimately finds that Knight was a third party

19   beneficiary of the terms and conditions of Bill 1703 under COGSA.

20        Accordingly, the Court **DENIES** Rohr's motion for partial summary

21   judgment as to Knight's liability under Carmack.

22                              CONCLUSION

23        For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES**

24   **IN PART** Defendant UPS Supply Chain Solution, Inc.'s motion for partial

25   summary judgment, **DENIES** Defendant Knight Transportation, Inc.'s renewed

26   motion for partial summary judgment, and **DENIES** Plaintiff Rohr, Inc.'s motion

27

28        [32] Knight also states that "the Carmack Amendment has significant exceptions to liability, including misdescription of the cargo," but offers no explanation of, or support for, this proposition.

1   for partial summary judgment in substantial part.

2          Subsequent to the transfer of this case to the undersigned, all remaining

3   deadlines and hearings set forth in the Court's amended scheduling order were

4   vacated.  *See* Doc. No. 82.  In addition, the mandatory settlement conference

5   previously set before the assigned magistrate judge was vacated.  *See* Doc. No. 83.

6   Accordingly, the Court instructs counsel for the parties to jointly contact the

7   Chambers of Magistrate Judge William V. Gallo **within seven (7) calendar days**

8   from the date this Order is filed, to discuss rescheduling the previously vacated

9   settlement conference and/or scheduling a case management conference.

10         **IT IS SO ORDERED**.

11

12  DATED:  April 8, 2013

13

14                                          HON. GONZALO P. CURIEL
                                            United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28